## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| John Ruszczyk, as Trustee for the next of kin of Justine Maia Ruszczyk,<br><br>       Plaintiff,<br><br>v.<br><br>Mohamed Mohamed Noor and Matthew Thomas Harrity, acting in their individual capacities as Minneapolis police officers; Janeé Harteau, acting in her official capacity as Minneapolis Chief of Police; Medaria Arradondo, acting in his official capacities as Minneapolis Assistant Chief of Police and Minneapolis Chief of Police; and The City of Minneapolis,<br><br>       Defendants. | Case No. _____<br><br>**COMPLAINT**<br><br>Jury Trial Demanded Under Fed. R. Civ. P. 38(b) |

For his Complaint, John Ruszczyk, in his capacity as Trustee for the next of kin of Justine Maia Ruszczyk ("Justine"), states and alleges as follows:

1. By order dated July 31, 2017, Hennepin County District Court Judge Mary Vasaly appointed Justine's father, John Ruszczyk ("Plaintiff"), as Trustee for the Next of Kin of Justine Maia Ruszczyk.

2. This is an action for money damages arising out of the July 15, 2017 fatal shooting of Justine resulting from a violation of her constitutional rights by on-duty Minneapolis police officer Mohamed Mohamed Noor ("Noor"). Plaintiff asserts Noor violated Justine's well-settled federal civil rights while acting under color of state law.

3. Plaintiff further asserts a claim against Noor and his partner, Defendant Matthew Thomas Harrity ("Harrity"), for conspiracy to cover up the true facts surrounding

the killing of Justine.

4.     Plaintiff further asserts claims against the City of Minneapolis (sometimes referred to herein as the "City") under *Monell v. Department of Social Services.*, 436 U.S. 658 (1978), and *Canton v. Harris*, 489 U.S. 378 (1989).

5.     Plaintiff is a resident of Freshwater, New South Wales, Australia, but is a citizen of the United States.

6.     Justine was, at all times material herein, a citizen of both the United States and Australia and a resident of Minneapolis, Minnesota.

7.     Upon information and belief, Defendants Noor and Harrity were at all times material herein citizens of the United States, residents of the State of Minnesota, and duly appointed and acting officers of the Minneapolis Police Department ("MPD").  They are sued in their individual capacities.

8.     Defendant Janeé Harteau ("Chief Harteau") was at times material herein a Chief of Police of the Minneapolis Police Department and a policy maker for the MPD.  She is sued in her official capacity.

9.     Defendant Medaria Arradondo ("Chief Arradondo") was at all times material herein an Assistant Chief of Police or the Chief of Police of the Minneapolis Police Department and a policy maker for the MPD.  He is sued in his official capacity.

10.     Defendant City of Minneapolis is a municipality duly incorporated under the laws of the State of Minnesota.

11.     Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and

1343(a)(3).  The aforementioned statutory and constitutional provisions confer original jurisdiction on this Court over this matter.

## BACKGROUND

### a. Justine Maia Ruszczyk – Counselor, Yoga Teacher, and Meditation Coach

12.    Justine was born on May 24, 1977, in Isfahan, Iran – where her birth was formally recorded at the United States Consular Office – to her father, Plaintiff, a U.S. citizen, and his late-wife, Margaret Ruth Ruszczyk, an Australian, entitling Justine to the dual citizenship alleged above.

13.    Justine's father owns and operates a bookstore where Justine worked throughout her high school and university studies.  On her return to Australia after her travels, she assumed a managerial role at the bookstore and stayed there for several years while building and developing her yoga and meditation teaching enterprises.

14.    Justine had one sibling, her brother, Jason Ruszczyk, with whom she had a beautiful relationship.  Jason and his wife, Katarina, have two children, and their family was extremely close to Justine.

15.    Aside from her family, Justine had a tightknit group of friends that resembled family – they were supportive "sisters" to one another.  To her friends' children, she was a godmother and "Auntie Juzzy."

16.    While, at times, Justine's studies, career choices and love for travel took her away from her family and friends, she had the extraordinary skill of maintaining a closeness with them as if she were living next door.

17.    Justine originally trained as a veterinary surgeon, having received her degree in

December 2002 from the University of Sydney, graduating with "honours, 2nd degree."

18.     Justine's mother, Margaret, died of cancer while Justine was in veterinary school.

19.     As life went on, Justine had a great relationship with both her father and his partner, Maryan Heffernan, who Justine lovingly called "Mem."  Maryan was like a second mother to Justine.

20.     In addition to her love for animals – which took her to Uganda, veterinary school and even the sewers of Minneapolis to save a family of ducklings – Justine also yearned to help people.  She studied and practiced yoga and meditation and changed career paths, turning to personal health.  Justine taught meditation classes and was preparing a curriculum for meditative training in the months leading up to her death.

21.     In 2012, Justine met her future fiancé, Don Damond ("Don"), while the two were at a meditation seminar.  Over time, the couple fell deeply in love.

22.     In January 2015, Don proposed while the couple was traveling in San Francisco.  Justine enthusiastically accepted Don's proposal.  It was to be Justine's first marriage.

23.     In March of 2015, following their engagement, Justine uprooted and moved from Australia to the United States, where she lived with Don and his son Zach at 5024 Washburn Avenue South in the Fulton neighborhood of Minneapolis.

24.     The couple's original plan was that Don would move to Australia, but Zach grew concerned about the possibility that being half a world away would strain his important relationship with his father at a critical time in his young life.  Responding to Zach's

4

concerns, and strong in her love for Don and Zach, plans changed and Justine agreed to move to Minneapolis.

25.     Justine and Don were to be married on August 17, 2017, in Kona, Hawaii, a point roughly midway from their family in Australia and their family in the United States. Invitations were sent and many guests scheduled and booked arrangements to attend the couple's wedding.

26.     Instead, on July 15, 2017, just one month before her wedding, 40-year-old Justine was killed by on-duty MPD officer Noor in the area outside her and Don's home.

27.     Justine endured pain and suffering from her mortal gunshot wound from the time it struck her until she died.

28.     Justine suffered the loss of her enjoyment of life, including marrying, parenthood, work, play, and loving familial relationships.

29.     Justine suffered the loss of wages and future economic opportunity.

30.     Justine suffered the loss of helping others find their way and their peace.

31.     Damages for the violation of Justine's civil rights, including her right to life, are governed exclusively by federal common law.

### b. The Neighborhood of Fulton – Friendly with a Small-Town Feel

32.     Justine and Don's neighborhood of Fulton is and was a peaceful place to live. The Fulton neighborhood website deems itself "the quintessential Southwest Minneapolis neighborhood," touting its friendliness and its small-town feel even within the heart of Minneapolis.[1]

---

[1] "About the Fulton Neighborhood" at https://fultonneighborhood.org/about-fulton/.

33.     According to the MPD's Neighborhood Statistics for January to July of 2017, the Fulton neighborhood consistently experienced minimal crime.[2]

34.     In June 2017, the statistics showed just 10 crimes in the Fulton neighborhood and in July 2017, the statistics showed just 11 crimes. [3]

35.      Overwhelmingly, the crimes reported in Fulton in 2017 were non-violent offenses.

### c.  Defendants Mohamed Mohamed Noor and Matthew Thomas Harrity – Inexperienced Partners

36.     Noor was 32 years old when he killed Justine.

37.     Noor had been hired as a police cadet by the MPD roughly two years prior, on March 23, 2015.

38.     The MPD police cadet program provides a condensed, expedited path for individuals to become police officers.

39.     The MPD Police Cadet Academy is a 29-week training program, after which the cadets are expected to promote to the title of police officer and to make a two-year commitment with the MPD.

40.     Noor had no law-enforcement experience before the MPD hired him.  He had previously worked as a hotel manager, health-care benefits specialist, and cell phone sales

---

[2] *See* Minneapolis Police Department Monthly Neighborhood Statistics at: http://www.ci.minneapolis.mn.us/www/groups/public/@mpd/documents/webcontent/wcmsp-207556.pdf (January 2017 statistics); http://www.ci.minneapolis.mn.us/www/groups/public/@mpd/documents/webcontent/wcmsp-207561.pdf (June 2017 statistics); http://www.ci.minneapolis.mn.us/www/groups/public/@mpd/documents/webcontent/wcmsp-207562.pdf (July 2017 statistics).
[3] *Id.*

person.

41.     Four citizen complaints have been filed against Noor in his capacity as an MPD officer since his date of hire.

42.     Noor's partner on July 15, 2017, was 25-year-old Harrity.

43.     Harrity was hired by the MPD on November 20, 2015, as a community service officer.

44.     On January 15, 2016, Harrity was hired as a MPD police officer.

45.     Two citizen complaints have been filed against Harrity in his capacity as an MPD officer since his date of hire.

### d. The Flawed Fitness for Duty Selection

46.     At the time Noor and Harrity were hired, the MPD used only one psychological test to screen its candidates for fitness for duty as police officers on the street.

47.     National best practices provide that multiple tests should be used to assess a candidate's ability to properly perform the duties of a police officer.

48.     In fact, prior to 2012, the MPD used five tests.

49.     The assessor who decreased the number of tests, with the City's approval – psychiatrist Dr. Thomas Gratzer – was hired in 2012.

50.     Gratzer personally lacked a crucial credential required by Minnesota law to assess candidates for police officer positions.  Minn. R. 6700.0700, subpart 1(I) requires the candidates be evaluated by "a licensed psychologist to determine that the applicant is free from any emotional or mental condition which might adversely affect the performance of peace officer duties."  At times material herein, no other Minnesota city relied on a

psychiatrist for pre-placement and fitness-for-duty assessments.

51.     Gratzer assessed Noor and Harrity when they were hired in 2015 and 2016, respectively, and, upon information and belief, he approved them after only subjecting them to one psychological screening test.

52.     Given all of the above, the use of deadly force by Noor on July 15, 2017, and the events following the fatal shooting of Justine occurred against the backdrop of inexperienced officers who appear, by their conduct, unfit for duty.

### e. MPD Body-Worn Cameras – Conscious Failures to Collect Evidence and Obey MPD Policies

53.     The City spent over $8 million to provide MPD officers with body-worn cameras ("BWC"s) known as the Axon Body 2 Camera System, a five year subscription to Evidence.com on the Axon Officer Safety Plan ("OSP"), and the corresponding training.

54.     "The Axon OSP provides both unlimited storage of the digital evidence and a robust platform for managing the digital evidence collected from the cameras."[4]

55.     The BWC is designed "for use in tough environmental conditions encountered in law enforcement, corrections, military and security activities."[5]  It is "designed to record events for secure storage, retrieval, and analysis via Evidence.com services."[6]

56.     On June 29, 2016, by **Special Order** of Chief Harteau, the MPD enacted the

---

[4] "Minneapolis Police Department Deploys 628 Axon Body 2 Cameras and Taser X2 Smart Weapons Standard To All Patrol Officers" *CISION PR Newswire* at https://www.prnewswire.com/news-releases/minneapolis-police-department-deploys-628-axon-body-2-cameras-and-taser-x2-smart-weapons-standard-to-all-patrol-officers-300297845.html.
[5] Axon Body 2 Camera User Manual at 1.
[6] Axon Body 2 Camera User Manual at 1.

BWC policy in effect at the time of Justine's death.[7]

57.     MPD's BWC Policy was explicitly enacted to capture real-time evidence in order to "enhance accountability and police trust" and also to provide "digital audio-video evidence for criminal, civil and traffic-related cases."[8]

58.     MPD's BWC Policy necessarily included officer accountability and evidence acquisition for civil cases alleging unconstitutional conduct, including the use of improper deadly force in violation of 42 U.S.C. § 1983 – which is a "significant incident" in the MPD BWC Policy.[9]  That term also includes "felony crime."[10]

59.     The BWCs provided to MPD officers in 2017 had three distinct modes: "off," "BUFFERING," and "EVENT."

60.     Putting the BWC into either of the two "operating modes" – "BUFFERING" and "EVENT" – requires affirmative action by the officer.

61.     When the BWC is turned "off" it does not capture video or audio data.  When the BWC is turned on, it enters its default mode.

62.     "The default mode, or BUFFERING mode, provides pre-event buffering to capture activity prior to the user activating the EVENT mode."[11]

63.     When the BWC is turned on and is in the "BUFFERING" mode, the "Operation LED" will blink green to alert the officer of that fact.[12]

---

[7] MPD Special Order Number SO16-016, "Manual Revision—4-223 Body Worn Cameras." (emphasis in original).
[8] *Id.* at I.
[9] *Id.* at III (defining significant incident and critical incident).
[10] *Id.*
[11] Axon Body 2 Camera User Manual at 1.
[12] Axon Body 2 Camera User Manual at 7.

64.     The data captured by the BWC while in "BUFFERING" mode will not be recorded to permanent memory *until* the officer takes a second affirmative action to switch the BWC to "EVENT" mode.

65.     Once the BWC "EVENT" mode is activated, the 30 seconds of buffered data captured directly prior will be saved and attached to the event in the BWC's permanent memory.

66.     Any data captured more than 30 seconds before the activation of "EVENT" mode will not be saved into the BWC's permanent memory and, consequently, is unavailable for review post-event.

67.     The 30 second pre-event recording limitation is known to MPD officers.

68.     When the BWCs are used in accordance with MPD policy by MPD officers, the key events prior to an event and the event itself are recorded.

69.     The 30 second pre-recording feature also ensures that even if an officer does not activate the "EVENT" mode expeditiously, the vital evidence leading up to the event will still be preserved along with the event itself.

70.     Both the "BUFFERING" and "EVENT" modes are key evidence-collection features of the BWC. Data captured by the BWCs in those modes is meant to be used to assist officers, prosecutors, and others.

71.     Research shows that MPD officers, including Noor and Harrity in this neighborhood alleyway, often rendered the key evidence-collection features of the BWC ineffective by either: 1) leaving the camera in the "off" mode; or 2) leaving the camera in the BUFFERING mode and failing to switch the camera to "EVENT" mode at the proper

time.  One of these alternatives, which required conscious behavior done in concert by Defendants Noor and Harrity, occurred when Justine was killed on July 15, 2017.

72.     Despite the fact that MPD officers, including Noor and Harrity, continued to consciously fail to use the BWCs in accordance with MPD policy requirements and the manufacturer's "User Manual," the officers suffered no adverse consequences.

73.     On July 15, 2017, Defendants Harrity and Noor's conscious and concerted failure to comply with the MPD BWC policy critical to evidence collection, and the MPD's failure to hold officers accountable in police-citizen encounters, collided with Justine, the 911 caller requesting police assistance for someone she thought was in danger.  The result: a nightmare come to life, without the evidence the MPD ordered its officers to collect and where, as a consequence, those same officers are free to speak (or not speak) with impunity, furthering their own interests rather than the interests of justice.

## JUSTINE'S 911 CALLS TO HELP A FEMALE SEXUAL ASSAULT VICTIM

74.     At approximately 11:24 p.m. on July 15, 2017, and prior to placing any 911 call, Justine called Don, who was in Las Vegas, Nevada, on business.  Justine described that she was hearing a woman in distress and that she believed the screams were coming from the alleyway behind their neighbor's home located at 5020 Washburn Avenue South.

75.     Don recommended that Justine call 911.  She agreed.

76.     At 11:27:01 p.m. on July 15, 2017, Justine called 911 from her home located at 5024 Washburn Avenue South, Minneapolis, Minnesota, to report what she had heard.

77.     During the call, Justine explained that she believed a woman was being sexually assaulted.

78.    Don had followed up with Justine by text message, and, shortly after making the 911 call, Justine responded to Don by text message to let him know that she had called 911 and that the authorities were on the way.

79.    At 11:35:22 p.m., more than eight minutes after her first 911 call, Justine called 911 again from her home.

80.    During this second 911 call, Justine explained that no MPD officers had arrived and expressed concern that Emergency Communications had the wrong address.

81.    During Justine's second call, the 911 operator verified her address and explained that MPD officers were on the way.

82.    Shortly thereafter, Justine called Don to report that she had followed-up with 911 because the police had not yet arrived.  Justine also explained to Don that she was still hearing the woman in distress.

83.    At the end of this call to Don, Justine said that the police had arrived.  Don asked Justine to call him back later.  The couple hung up.  This was the last time they would speak.

## DEFENDANTS' ARRIVAL TO THE NEIGHBORHOOD ALLEYWAY AND JUSTINE'S FATAL SHOOTING

84.    On the fateful evening of July 15, 2017, Defendants Noor and Harrity were riding in Minneapolis police squad 530.

85.    Harrity was the driver of the squad car, while Noor was riding in the front passenger seat.

86.    Squad 530 is a Ford Police Interceptor, which is very similar in size and appearance to a Ford Explorer.

87.     At 11:27:42 p.m., Minneapolis Emergency Communications aired a call to send squad 530 to respond to Justine's report of a "female screaming behind building," directing the squad to 5024 Washburn Avenue South.

88.     At 11:27:47 p.m., Defendants Noor and Harrity were dispatched to 5024 Washburn Avenue South for "UNK TRBL" (unknown trouble).

89.     Harrity drove the squad car from the area of 36th Street and Blaisdell/Nicollet Avenues to the entrance of the neighborhood alleyway at 50th and Xerxes.

90.     At 11:36:04 p.m., Defendants Noor and Harrity were notified about Justine's second 911 call via their squad computer.

91.     At 11:37:40, MPD squad car 530, still driven by Harrity, with Noor in the front passenger seat, entered the neighborhood alleyway on 50th Street and headed south.

92.     MPD policy required that Noor and Harrity's BWCs be activated when responding to Justine's 911 call reporting a possible sexual assault.[13]

93.     The MPD BWC Policy stated: "[a]ctivation [of BWC] shall occur as soon as possible, but before any citizen contact."[14]

94.     Activation, as defined by the MPD BWC Policy, means: "Any process that causes the BWC system to record audio or video data."[15]

95.     Therefore, "activation" of the MPD BWC means to have the device in "EVENT" mode, as defined by the Axon Body 2 User Manual.

---

[13] MPD Special Order Number SO16-016, "Manual Revision—4-223 Body Worn Cameras" at IV(E)(1)(a)(manual activation of BWC required for any contact involving criminal activity; any contact that is or becomes adversarial).
[14] *Id.* at IV(E)(1)(b).
[15] MPD Special Order Number SO16-016, "Manual Revision—4-223 Body Worn Cameras" at III.

96.     MPD Policy 4-223 required activation of the BWCs both as Noor and Harrity entered, and later as they traveled through, the neighborhood alleyway, given the facts known to the officers regarding Justine's 911 call.

97.     Despite this requirement, before they entered the neighborhood alleyway, both front seat occupants and partners Noor and Harrity made the conscious decision *not* to activate the operating modes on the BWC each was equipped with and wearing.

98.     Noor and Harrity both consciously rendered their BWCs (critical evidence-collection devices), including the pre-event recording feature, useless.

99.     Although they did not activate the operating modes of their BWCs as they entered the neighborhood alleyway, Noor and Harrity saw fit to make the conscious and concerted decisions to turn off the squad's headlights, dim the computer screen, and use the spotlight on the driver's side of the squad car for illumination.

100.     Yet, even being compelled to do all those things, Noor and Harrity, in concert, again decided *not* to manually activate the their BWCs.

101.     Noor and Harrity, in concert, further decided *not* to manually activate their BWC's despite Harrity's claim (made later and after consultation with his attorney) that Harrity had subjectively decided to "remove the safety hood of his holster."

102.     If Harrity's post-attorney consultation claim is true, the action of removing the safety hood of his holster alone would require his and Noor's BWCs to be activated.[16]

103.     What is certain is that neither Noor nor Harrity decided to switch their BWCs into "EVENT" mode as they proceeded through the neighborhood alleyway – despite the

---

[16] MPD Special Order Number SO16-016, "Manual Revision—4-223 Body Worn Cameras" at IV(E)(1)(a)(manual activation of BWC required prior to any use of force).

supposed subjective safety concern Harrity later claimed to have and which was discussed in the criminal complaint against Noor. Had they done so, there would be video and audio recording of the fatal shooting of Justine, and Harrity and Noor would not be free to concoct a story in a vain attempt to insulate Noor from civil and criminal liability.

104.    Noor has invoked his Fifth Amendment right against self-incrimination to avoid criminal and civil liability.

105.    With lights off, computer dim, spotlight on, but their BWCs in a mode ensuring that no data would be preserved, Harrity drove squad 530 slowly down the neighborhood alleyway.

106.    Harrity did not stop squad 530 behind Don and Justine's home at 5024 Washburn Avenue, and neither Noor nor Harrity got out of the vehicle to investigate the area that was the subject of Justine's 911 calls. They just drove by.

107.    Noor and Harrity reportedly did not encounter any individuals during their drive through the neighborhood alleyway.

108.    Squad 530 neared the end of the neighborhood alleyway at 51st Street at approximately 11:39:34 p.m. and, at that time, Noor entered "Code 4" into the squad computer.

109.    "Code 4" is the signal meaning a situation is under control and responding squads that have not yet arrived may clear.

110.    "Code 4" is the objective antithesis of facts authorizing an objectively reasonable use of deadly force.

111.    Harrity then accelerated as he drove the squad car toward the end of the

neighborhood alleyway.

112.   At or around this time, Harrity reportedly and consciously turned on the headlights of the squad car.

113.   Nearing the end of the neighborhood alleyway, Harrity reportedly told Noor that as soon as a bicyclist cleared their path, they would leave to respond to another call.

114.   The bicyclist Harrity referenced was located to the right of the squad 530 and was traveling on 51st Street towards Xerxes Avenue.

115.   Noor reportedly fired his duty weapon across Harrity's lap, out the open driver's side window of squad 530 fatally striking Justine at center mass – killing the very 911 caller who had requested help from the officers.

116.   Through their numerous conscious decisions, made in concert, the two officers in the front seats of squad 530 failed to properly activate the recording and permanent memory function of their BWCs at several mandatory points in their call response. Noor and Harrity thus conspired to frustrate and violate the civil rights of any individual they would meet in the neighborhood alleyway – whether it be the sexual assault perpetrator that Justine reported, *the victim of that assault*, another resident or visitor of the Fulton neighborhood, or *Justine herself* – by conscious deprivation of evidence they were ordered to obtain to enhance accountability and the public trust.

117.   Again, Noor has invoked his Fifth Amendment right against self-incrimination to avoid criminal and civil liability.

118.   According to admissions made by then-Chief Harteau, Noor and Harrity *should have* "activated" their body-worn cameras prior to the shooting of Justine on July 15,

16

2017.[17]

119.    Chief Harteau admitted the truth: "Justine didn't have to die."

120.    There *should be* audio-video evidence of the events leading up to Noor's fatal shot.

121.    There *should be* audio-video evidence of Noor killing Justine.

122.    There *should be* audio-video evidence of the immediate aftermath of the shooting.

123.    Instead, no MPD squad or body camera captured Noor's July 15, 2017 fatal shooting of Justine.

124.    Noor and Harrity's conscious decisions, made in concert, on July 15, 2017 deprived the investigators, the charging authority, and the state criminal and federal case jurors of the digital audio-video evidence the officers were mandated to obtain – including, evidence that would incriminate Noor, evidence that would expose the false statements of Harrity, and evidence that would show the public and the jurors in both the criminal and civil trials the truth of the circumstances of Justine's death.

125.    Noor and Harrity made these conscious decisions, in concert, because it was commonplace to do so in the MPD, knowing that evidence needed to convict a police officer would be lost, and because Chief Harteau and then Assistant Chief Arradondo failed to require adherence to the MPD's BWC Policy, particularly with regard to critical evidence collection.  Noor and Harrity did so to protect themselves – to insulate any lies they might later tell and to insulate Noor from the consequences of his decision to invoke the Fifth

---

[17] "Harteau: 'Justine didn't have to die'" at https://www.kare11.com/article/news/harteau-justine-didnt-have-to-die/458345785.

Amendment from digital debunkment – apparently without any significant pushback from MPD command and control.

126.    Noor and Harrity's conscious decisions, made in concert, to ignore the mandates of the policy requiring the BWCs to be turned on and activated for this "significant incident" and "[p]rior to any use of force" lessened the likelihood of MPD police accountability and obliterated public trust.   MPD Policy 4-223, Section IV, subd. (E)(1)(a).

127.    Justine had not committed any crime.

128.    Justine had not displayed any aggression.

129.    Justine was unarmed.

130.    Justine was dressed in her pajamas.

131.    Justine stood approximately 5'7" and weighed approximately 125 pounds.

132.    Justine posed no threat to the officers or anyone on the scene.

133.    Recognizing this, Harrity did not engage his trigger, let alone fire his weapon on July 15, 2017.

134.    Yet, upon information and belief, Noor shot Justine sometime after 11:40:15 p.m. and before 11:40:29 on July 15, 2017.

135.    Finally, BWC(s) began capturing events of July 15, 2017.   The BWC video shows Noor and Harrity outside squad car 530, standing over Justine.

136.    Harrity radioed: "Shots fired, one down, EMS Code 3," meaning he requested immediate assistance.

137.    According to the incident detail report, at 11:41:46, squad 530 entered "one

down…starting CPR."

138.    The importance of BWC evidence is established by the post-shooting evidence actually captured.

139.    A BWC video shows the first conversation between Harrity and the first supervising sergeant at the scene, Shannon Barnette ("Barnette").

140.    During this conversation, Harrity told Barnette that he and Noor were on a call and were getting ready to clear and go to another call when "she came up on the side out of nowhere" and "we both got spooked."

141.    Harrity reported to Barnette that he had his gun out, but Noor "pulled out and fired" without stating any fact that could form an objectively reasonable basis for such a decision.

142.    Importantly, Harrity did *not* tell Barnette he had heard a voice prior to Noor shooting. This claim came later after consulting with his attorney, who is the main attorney for the Minneapolis Police Federation.

143.    Importantly, Harrity did *not* tell Barnette that he heard a noise prior to Noor shooting. This claim came later after consulting with his attorney, who is the main attorney for the Minneapolis Police Federation.

144.    Importantly, Harrity did *not* tell Barnette that he believed his life was in danger. This claim came later after consulting with his attorney, who is the main attorney for the Minneapolis Police Federation.

145.    Other MPD officers arrived to the scene to find Justine laid in the neighborhood alleyway behind her home in the Fulton neighborhood.

146.    Minneapolis Fire Department ("MFD") personnel also arrived on scene.

147.    MFD report 17-0025837 noted: "E28 arrived to 51 St. W./Washburn north neighborhood alleyway and found several MPD officers doing CPR. MPD Officer stated that they had been doing CPR for about 4 minutes. E28 checked for pulse, no pulse."

148.    MFD report 17-0025837 also noted: "We also check (sic) the lower abdominal bullet entry. There was lots of blood but could not find exit wound."

149.    Hennepin County Medical Center ("HCMC") paramedics also arrived and checked for a pulse, but found none.

150.    The HCMC paramedics called off CPR.

151.    All life-saving efforts had failed. Justine died painfully at the scene.

152.    Other MFD reports noted that MFD personnel were called back twice to the scene to wash down the blood. After doing so, the alleyway remained stained by Justine's blood.

## THE AFTERMATH

153.    Around July 18, after the Minnesota Bureau of Criminal Apprehension ("BCA") said that Noor shot the unarmed Justine from inside the squad car, then-MPD Chief Harteau described that she then realized the extent of the situation because: ***Harrity offered no defense of the shooting and "[i]t was clear to [Harteau] that he didn't know why this happened.***"[18]

154.    Chief Harteau's professional and command conclusion is justified since no fact or facts were present that would justify an objectively reasonable officer making a

--------

[18] Adam Belz, "Minneapolis Mayor Betsy Hodges says she lost confidence in Chief Janeé Harteau months before Damond shooting," *Star Tribune,* October 4, 2017.

decision to use deadly force on Justine.

155.    The same is true for then-Minneapolis Mayor Betsy Hodges's ("Hodges")

conclusion, as she agreed that Justine *should not* have been shot.

156.    Less than a week after Justine's homicide, at the request of Hodges, Chief

Harteau resigned.

157.    Hodges noted she had "lost confidence in the chief's ability to lead us further"

and that "it [was] clear that she [had] lost the confidence of the people of Minneapolis as

well."[19]

158.    Arradondo became the acting MPD Chief and was officially sworn into the

position in September 2017.

159.    Meanwhile, the investigation into Noor's fatal shooting of Justine continued.

160.    Testing and comparisons confirmed that the bullet recovered from Justine's

body was fired from Noor's gun.

161.    The Hennepin County Medical Examiner ("HCME") performed an autopsy

on Justine.

162.    The HCME determined that: 1) Justine sustained a single gunshot wound; 2)

she died of the gunshot wound to the abdomen; and 3) the manner of death was homicide.

163.    The HCME noted that the bullet fired from Noor's gun had a backward,

rightward, and slightly downward trajectory and the bullet wound was 65 centimeters from

the top of Justine's head, 104 centimeters above her left heel, and approximately 8

centimeters from the center of her body.

---

[19] *Id.*

164.    Inspection of MPD squad 530 showed that there was no damage to the vehicle.

165.    In December 2017, an independent laboratory in Pennsylvania conducted additional testing on squad 530 and the clothing worn by Noor, Harrity, and Justine.

166.    The Pennsylvania lab determined that there was gunshot residue on the ceiling of the driver's side, the interior of the driver's door, the steering wheel, the driver's headrest, and the dashboard on the driver's side of MPD squad car 530.

167.    The Pennsylvania lab determined that there was also gunshot residue on Justine's shirt sleeves and the front of her shirt.  Her pants tested negative.

168.    The Pennsylvania lab determined that the left and right sides of both shirts Harrity was wearing, the front of his vest and both legs of his pants tested positive for gunshot residue.

169.    The Pennsylvania lab determined that Noor's right and left pant legs and the right side of his shirt tested positive for gunshot residue.  Noor's vest and the left side of his shirt tested negative.

170.    Following Harteau's departure, Hodges was defeated by Jacob Frey in the mayoral race.

171.     Other changes occurred after Noor's killing of Justine, including to Harrity's version of the July 15, 2017 incident – changes more tailored to an evolving defense of his partner with whom he had made so many decisions that night.

172.    After Harrity was represented by counsel, who is also counsel for the Minneapolis Police Federation, he gave a different and contrived description of the events of

July 15, 2017.

173.    Harrity was able to change his story because: 1) Justine died; and 2) there is no audio-video evidence to contradict him thanks to his and Noor's several conscious decisions, made in concert, not to properly activate the operating modes of their BWCs as required by MPD policy.  Conveniently, Defendant Noor has invoked his Fifth Amendment right to remain silent so as not to incriminate himself.

174.    Most notably added to the *later* version of events provided by Harrity was that, five to ten seconds after Noor entered Code 4 into the computer, Harrity heard a voice, a thump somewhere behind him on the squad car, and caught a glimpse of a person's head and shoulders outside his window.

175.    Harrity could not articulate what the noise was.

176.    Harrity could not articulate how loud the noise was.

177.    Harrity could not articulate what the person's voice sounded like.

178.    Harrity could not articulate what the person said.

179.    Harrity characterized the voice as muffled or a whisper.

180.    Harrity could not see whether the speaker was a male, female, adult or child.

181.    But, Harrity claimed he could not see the person's hands from his position in the driver's seat.

182.    Harrity estimated during this *later, different* description of the events of July 15, 2017, that the person was two feet away from him.

183.    Harrity admittedly saw no weapons.

184.    Harrity claimed he was subjectively startled and said "Oh shit" or "Oh Jesus."

185.    Harrity subjectively claimed that he (now) subjectively perceived that his life was in danger, without stating any objectively reasonable basis for that subjective belief.

186.    Based on Harrity's statement, there is *no* objectively reasonable basis for that claim.

187.    Harrity claimed he reached for his gun.

188.    Harrity claimed he unholstered his gun.

189.    Harrity claimed he held his gun to his ribcage while pointing it downward.

190.    Despite these claimed sensory observations and claimed reactive conduct, Harrity never hit the easily accessible "EVENT" button on his chest.

191.    Harrity admitted that from the driver's seat he had a better vantage point to determine "a threat" than Noor would have from his position in the passenger seat.

192.    Harrity claimed, *incredibly,* that he then heard what sounded like a light bulb dropping on the floor and saw a flash.

193.    A .40 caliber gunshot fired in the closed space of a squad car ***does not*** sound like a light bulb dropping on the floor.

194.    This ridiculous after-the-fact description of what he heard is inconsistent with Harrity's claim that he immediately checked if he had been shot.

195.    After checking himself for gunshot wounds, Harrity then reportedly looked to his right and saw Noor with his right arm extended in his direction.

196.    Harrity claimed he did not see Noor's gun.

197.    Harrity reported that he next looked out the driver's side window and saw a woman.

198.    The woman was the unarmed Justine in her pajamas.

199.    Harrity claimed he saw Justine put her hands on a gunshot wound on the left side of her abdomen and heard her say: "I'm dying" or "I'm dead." Obviously, this is indicative of Justine's ultimate understanding of the seriousness of her wounds and the effect on her body's continued existence.

200.    Harrity claimed that it was only once he saw Justine's hands that he no longer subjectively believed her to be a threat and got out of the squad car.

201.    There has never been any articulation of any objectively reasonable basis to conclude that Justine was any type of threat, let alone one that justified the use of deadly force.

202.    Even under this version of the events of July 15, 2017, that includes convenient new and contrived details, Justine posed no threat to the officers.

203.    The officers had no deadly force authorization. Harrity recognized this fact by a no-shoot decision.

204.    Noor reportedly exited the squad car and was still carrying his handgun.

205.    Noor reportedly only re-holstered his gun when Harrity directed him to do so.

206.    Noor reportedly only turned "on" his BWC after Harrity told him to do so,[20] a fact that confirms Harrity's knowledge of the requirement to turn the cameras into an operating mode that permanently preserves the audio and video data.

207.    While Harrity's story has changed, after the involvement of his attorney, to conveniently provide an irrelevant and subjective basis for his "fear," in an attempt to

---

[20] *See State of Minnesota v. Mohamed Mohamed Noor*, Court File No. 27-CR-18-6859 at 4.

provide cover for Noor when the criminal trial arrives, Noor invoked and has maintained his Fifth Amendment right to remain silent for over a year.  Noor has **never** provided **any** explanation for why he shot and killed Justine on July 15, 2017.

208.    Noor declined to speak with investigators from the BCA.

209.    Noor declined to speak with the Hennepin County Attorney's Office.

210.    Numerous other MPD officers repeatedly refused to provide statements to the Hennepin County Attorney's Office during its investigation of the July 15, 2017 shooting of Justine.

211.    This was done at the order, behest or strong suggestion of the Minneapolis Police Federation with the advice of counsel.

212.    Because numerous MPD officers refused to cooperate with the investigation, the Hennepin County Attorney's Office – which, *on a daily basis*, works with MPD officers to prosecute cases in the County – had to convene a grand jury to force the officers' testimony. This unprecedented step was necessary because of: 1) the systemic lack of cooperation by these MPD officers; 2) Noor's invocation of the Fifth Amendment; and 3) the lack of digital audio-video evidence caused by Noor and Harrity's several conscious and concerted decisions not to obey their Standing Order to collect that evidence by properly using their BWCs.

213.    The Hennepin County Attorney's Office was required to subpoena approximately 40 officers to provide testimony to the grand jury.

214.    Hennepin County Attorney Mike Freeman stated that during his 19 years as a prosecutor, "this [was] the first time that [he's] ever had to subpoena police officers to tell

26

[prosecutors] what they know."[21]

215.    In response to criticism regarding the MPD officers' failure to cooperate with the Hennepin County Attorney's Office, Minneapolis Police Union President Bob Kroll noted that MPD officers were "upset" about the charging of Efrem Hamilton.[22]

216.    In Mr. Hamilton's recent trial, the Hennepin County prosecutor who tried the case noted that the case was hampered by a "blue wall of silence."

217.    The "blue wall of silence" was evident during the Hamilton trial when three MPD officers changed their testimony from what they previously reported to the prosecutor – all to support and defend Hamilton.  These Hamilton officers and the roughly 40 officers needing grand jury subpoenas in the investigation of the fatal shooting of Justine demonstrate the impunity with which MPD officers treat MPD policies, the need to tell the truth, and their obligations under the Constitution.

218.    The blue wall of silence remains alive and well within the MPD due to the lack of consequences imposed on officers who change their stories in order to protect one of their own or who, in violation of their sworn duties as peace officers, fail to cooperate with the prosecuting authority.  Chiefs Harteau and Arradondo have failed to hold such officers accountable.

219.    Numerous MPD officers continue to hamper the Hennepin County Attorney's Office's ability to investigate and prosecute alleged wrongdoing by their fellow officers.

---

[21] Libor Jany, "Tension rises between county attorney, police union in Noor grand jury investigation" *Star Tribune*, February 28, 2018.
[22] *Id.*

220.     Specifically, with regard to the July 15, 2017 shooting of Justine, it includes Harrity materially altering his description of the incident, or attempting to withhold statements or testimony and numerous other officers refusing to cooperate with the investigation.

221.     Many uncooperative MPD officers stated they were following the advice of the police federation or their lawyers when they failed to cooperate in the investigation of Noor's fatal shooting of Justine.[23]

222.     Not only are MPD officers routinely not disciplined when they change their stories or fail to cooperate with investigations into fellow officers, the Minneapolis Police Federation is empowering them to do so.  There has been no response by the City, former Chief Harteau or current Chief Arradondo to curb this practice of behavior by MPD officers and the Minneapolis Police Federation.

223.     These actions of the uncooperative MPD officers, and the failures of the City, Chief Harteau and Chief Arradondo to discipline the officers for such conduct, fly in the face of MPD's Code of Conduct, and were a moving force behind the deprivation of Justine's federal civil rights.

224.     Noor was never the subject of, let alone disciplined as a result of, any MPD Internal Affairs investigation of Justine's homicide.

225.     MPD Policy Section 5-101.01 provides that:

> The integrity of police service is based on truthfulness.  Officers shall not willfully or knowingly make an untruthful statement, verbally or written, or knowingly omit pertinent information pertaining to his/her

---

[23] Libor Jany, "Tension rises between county attorney, police union in Noor grand jury investigation" *Star Tribune*, February 28, 2018.

official duty as a Minneapolis Police Officer.

MPD employees shall not willfully or knowingly make an untruthful statement or knowingly omit pertinent information in the presence of any supervisor, intended for the information of any supervisor or before any court or hearing. Officers shall not make any false statements to justify a criminal or traffic change or seek to unlawfully influence the outcome of any investigation.

These requirements apply to any report, whether verbal or written, concerning official MPD business including, but not limited to the employee's employment or position regardless of whether such information is requested during a formal investigation or during the daily course of business.

226.    The MPD's continued failure to discipline officers, through Defendants and policymakers Chiefs Harteau and Arradondo, causes MPD police officers to act with impunity and without due regard for the Constitution and laws of the United States, including 42 U.S.C. § 1983.

227.    On March 20, 2018, a few months after the grand jury convened, Noor was charged by Complaint with third-degree murder and second-degree manslaughter for the July 15, 2017 shooting death of Justine.

228.    Noor was fired from the MPD on the same day.

229.    Noor's firing was not the result of any MPD Internal Affairs investigation.

230.    Noor was not afforded any pre-firing due process in accordance with MPD policy and the collective bargaining agreement.

231.    Noor has continued his silence throughout the hearings relating to his criminal charges.

232.    Noor has entered a not guilty plea on his criminal charges.

233.    Noor continues to assert the Fifth Amendment right against self-incrimination

with regard to his July 15, 2017 fatal shooting of Justine.

## MPD'S NONCOMPLIANCE WITH BWC POLICIES

234.    Minneapolis law enforcement officers touted the Axon Body 2 Camera system

as a "powerful evidence gathering tool" that would help repair fractured relationships

between the police department and the community they serve.  Neither goal can be achieved

if the Axon Body 2 Camera System is left in the "off" position or not properly used in its

two operating modes by MPD officers.

235.    MPD Policy 4-223, Section 1, Purpose, which was in effect on July 15, 2017,

stated:

> With the goal of enhancing accountability and public trust this policy will
> provide MPD personnel with procedures for the use and management of
> Body Worn Camera (BWC) equipment, and the access, retention, storage, and
> retrieval of recorded media captured by BWC equipment.  The purpose of
> BWC equipment use by Minneapolis Police Department officers is to
> accomplish the following:
>
> - Enhance accountability and public trust by preserving evidence of
>   officer interaction with citizens.
> - Capture digital audio-video evidence for criminal, civil and traffic-
>   related court cases.
> - Assist officers with recalling facts or other details captured by the
>   equipment that will help them accurately articulate a chain of events
>   when writing reports.
> - Serve as a training tool for officer safety and best practices in the
>   MPD.
> - Assist in the assessment of contacts between officers and the public by
>   reviewing procedures and interpersonal actions.

236.    Further, Policy 4-223, Section II, subd. C stated: "Employees failing to adhere

to this policy or applicable laws regarding the use of BWCs and any associated data,

including but not limited to restrictions regarding accessing such data, are subject to

discipline, up to and including termination."

237.    Statistics from the MPD show that, during July 2017, officers were not

activating their BWCs when required about 82 percent of the time.

238.    An audit completed by the City of Minneapolis Internal Audit Department,

dated September 19, 2017, described many issues regarding mobile and body-worn video

recording equipment within the MPD.

239.    Audit finding number 1 describes numerous instances of non-compliance with

the MPD body-worn camera policy.  The noncompliance identified in the audit included:

- Instances where MPD officers (e.g. SWAT officers) were **not** being required to use body-worn cameras, even though the policy required their use.
- Instances where 911 dispatches and use-of-force events **did not** have corresponding video in evidence.
- Instances of inconsistent entry to explain the nonexistence of the video.
- Officers were not properly running body-worn camera start-up checks.
- Officers were not properly turning on their body-worn cameras so that pre-event recordings would not be captured.
- Officers transporting individuals to jail were deactivating their cameras.
- Officers **failed to** narrate the reason for body-worn camera deactivation prior to an event conclusion.
- Officers **failed to** categorize body-worn camera videos, including failing to assign any category or assigning incorrect categories.
- Officers **failed to** enter the correct case numbers related to the body-worn camera videos.
- Officers **failed to** upload body-worn camera videos at the end of their shifts.
- Supervisors **failed to** conduct reviews of the body-worn camera use.  Further, the supervisors were not trained on conducting such reviews until June of 2017.

240.    Further, the September 19, 2017 audit noted issues with the MPD body-worn

camera policy itself – including the Policy's failure to follow the Minnesota statutory

requirements.

241.    The audit also noted that MPD officers were leaving their cameras powered
"off," thereby preventing the pre-event recording feature from capturing events that
occurred prior to the record button being activated.

242.    About two weeks after Noor killed Justine, the MPD modified its BWC
Policy, requiring MPD officers to activate the cameras when responding to nearly *any* **call.**
The current policy requires BWC activation within two city blocks *before* officers' arrival to a
call location.

243.    Then-Mayor Hodges and the Minneapolis City Council ordered the MPD to
monitor and analyze its officers' body camera use and provide quarterly reports.

244.    As the deadline for the first quarterly report approached, MPD had not hired
personnel to perform the monitoring and began complaining that it was too labor-intensive
of a process.

245.    The first quarterly audit only analyzed 248 videos from MPD officers between
October 1, 2017, and December 1, 2017.

246.    Nonetheless, the audit found similar issues that were reported in the earlier
September 19, 2017 audit of MPD officers' use of BWCs and those that occurred due to the
conscious decisions of Noor and Harrity on July 15, 2017.

247.    Specifically, the second audit found that officers were: 1) wearing cameras but
not turning them on; 2) improperly turning off the cameras before the incident was
completed; 3) blocking the camera lens; and 4) improperly categorizing the video.

248.    The MPD and City policymakers such as Chiefs Harteau and Arradondo allow
and foster an environment of noncompliance with departmental policies.

249.   The MPD failed to and continues to fail to hold its officers accountable for noncompliance with policies.

250.   The MPD continues to ignore **_orders_** to track compliance of BWC.

251.   Chiefs Harteau and Arradondo, and others who report to them, are charged with the duty to enforce this Policy.

252.   Failure to enforce this Policy cripples the effort to have accountability and collect damning evidence and, instead, allows MPD police officers to act with impunity, without regard to their oath, in violation of state and federal law.  This allows the officers to try to make the truth whatever they say it is, something antithetical to the BWC Policy as written.  It is a moving force in officers' improper use of force, including improper deadly force.

## MPD'S LESSENED MENTAL FITNESS REQUIREMENTS

253.   Police departments across the nation utilize psychological screening to weed out applicants that are not a good fit for police work before the officers are hired.

254.   The purpose of such screening is to help departments ensure that their officers are able to safely and effectively perform their job duties as police officers.

255.   The national best practice is to use multiple tests when evaluating a candidate's mental stability and psychological suitability to police work, including life and death, shoot-no shoot decisions.

256.   In many states, including Minnesota, it is a legal requirement that applicants pass a psychological evaluation.[24]

---

[24] Minn. R. 6700.0700, subpart 1(I).

257.    However, in Minnesota, the cities and departments themselves are able to determine what testing is administered to candidates.

258.    Throughout the years, Minneapolis frequently changed the providers it used to assess candidates and, in 2012, the City switched to Gratzer.

259.    Gratzer was found and hired without a formal bidding process because he was part of a network of physicians the City was already using for paid medical opinions.

260.    Gratzer is a clinical psychiatrist with a subspecialty certification in Forensic Psychiatry.

261.    By definition, a psychiatrist specializes in the diagnosis and treatment of mental illness.  Psychiatrists are also able to prescribe medication.

262.    Gratzer's disclosed experience in his subspecialty was as a "Senior Forensic Psychiatrist" at the Minnesota Security Hospital from July of 1995 to August of 2002 and as a provider of medical opinions on people making claims for injury by third parties at EvaluMed using "retrospective review" of records.

263.    EvaluMed is "a leading independent medical evaluation and medicolegal services company" meaning that it primarily handles medical records review, depositions and medical-opinion programs in the context of automobile liability, workers' compensation and disability insurance cases.[25]

264.    The City itself has stated the relevant and important "Qualifications and Experience" for those assessing the pre-placement and fitness for duty of MPD officer

---

[25] "MES Group Acquires EvaluMed" at https://www.baileysouthwell.com/mes-group-acquires-evalumed/.

candidates, specifically including included the following:

- Examiner must be trained and experienced specifically in the provision of pre-placement and fitness for duty psychological evaluations for public safety positions, and must participate in regular, ongoing continuing education and training that is specific to pre-placement and fitness for duty screenings in addition to that of a more general police psychology nature

- Examiners should be familiar with the current research literature available on psychological testing for public safety positions, essential functions, responsibilities and public expectations.

265.    Dr. Grazter's Curriculum Vitae does not reveal or disclose *any* such qualifications or experience.

266.    Moreover, the "Education;" "Certifications, Licenses;" "Academic Appointments;" "Hospital [P]rivileges;" "Academic Achievements;" "Teaching Experience;" "Committees;" "Computer Experience;" "Publications;" "Papers (published);" and "Presentations (Refereed)" sections within Gratzer's Curriculum Vitae fail to demonstrate even the slightest interest in "pre-placement and fitness for duty" issues for police or any law-enforcement job.

267.    In addition to not meeting the requirements of Minnesota law, prior to being hired by the City in 2012, Gratzer had *zero* experience evaluating individuals' fitness for duty as police officers.

268.    After his hiring in 2012, Gratzer made changes in the tests used to evaluate candidates for positions within the MPD.

269.    With the MPD's knowledge and approval, Gratzer reduced the psychological screening tests used from *five* to *one*.

270.    In decreasing the number of tests used to screen applicants, the City ignored

its own study that found the other tests were effective in identifying problematic officers, including officers who were not mentally equipped to manage the decisions a police officer faces (i.e., avoiding misconduct, making life-and-death decisions.)

271.   Cities comparable to Minneapolis use between three and six screening tests in their assessment.

272.   Nonetheless, the City paid EvaluMed at least double for each assessment Gratzer performed, and for less work, given that Gratzer only had one screening test administered to candidates, not three or six.

273.   The lessened psychological testing protocol implemented by Gratzer caused the MPD to hire and put police officers on the streets of Minneapolis who were not fit for the job and were unable to objectively process the facts of any given situation including proper use of force decisions.

274.   The reduced psychological testing protocol implemented by Gratzer and described above was in place when Defendants Noor and Harrity, along with approximately 200 other officers, were screened and hired.

275.   After Noor fatally shot Justine on July 15, 2017, the City and MPD began efforts to replace Gratzer.

276.   In a December 14, 2017 article for American Public Media, Curtis Gilbert wrote: "[police leaders] said, they decided to search for a new mental health evaluator because Gratzer screened out a larger percentage of minority applicants, which alarmed them."[26]

---

[26] Curtis Gilbert, "Minimizing Mental Fitness Minneapolis police recruits get less

277.    Notably, the City and MPD admit they did not replace Gratzer because he implemented a less-rigorous screening procedure for candidates, but a reasonable inference is that was indeed the reason, given the timing and public outcry.

278.    Arradondo, while claiming he has no concerns over any officers approved by Gratzer, now intends to make sure the City and the MPD follow Minnesota law requiring a psychologist to evaluate candidates.

279.    And, while Arradondo acknowledges that he "absolutely want[s] to see our diversity increase," he concedes that "the stakes are so high, [diversity] can't be the only thing."[27]

280.    Upon information and belief, the City and MPD have hired Dr. Jan Tyson Roberts ("Roberts") to evaluate MPD candidates.

281.    Roberts is a licensed psychologist, but like Gratzer, she has *zero* experience evaluating individuals' fitness for duty as police officers.

282.    The inadequate assessor and assessment procedure in place since 2012 ensured that the City hired MPD officers that are unable to safely and effectively perform their job duties as police officers – including Defendants Noor and Harrity, who were approved by Gratzer.

283.    These decisions and practices, implemented by Gratzer with the City's approval, put in place officers who are not able to deal with the actual realities of street situations in an objectively reasonable way.  Instead, they bring stress, drama, and subjective fear rather than professionalism to these street encounters, including those with unarmed

---

psychological testing than they used to" *American Public Media*, December 15, 2017.
[27] *Id.*

911 callers in their pajamas seeking only to help others.  These decisions are a moving force in officers' improper use of force, including improper deadly force.

284.    The consequence is that certain MPD officers are ill-prepared, ill-equipped and unfit to perform obvious and recurring duties of police officers, including the use of force and the use of deadly force.  Here, it led to the fatal shooting of Justine who stood unarmed, in her pajamas, and ready to help others.

## COUNT I

### 42 U.S.C. § 1983 – FOURTH AMENDMENT VIOLATIONS
### *Plaintiff v. Defendant Mohamed Mohamed Noor in his individual capacity*

285.    Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

286.    By the actions described above, Noor, under color of state law, by the intentional and objectively unreasonable use of deadly force, violated and deprived Justine of her clearly established and well-settled civil rights to be free from unreasonable searches and seizures and the use of excessive, unreasonable, and deadly force in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

287.    Justine died as a direct and proximate result of Noor's unconstitutional conduct and her next-of-kin were thereby damaged in an amount exceeding $50,000,000.

288.    Noor subjected Justine to these deprivations of her rights in such a manner so as to render Noor liable for punitive damages.

289.    Punitive damages are available against Noor and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn.

CASE 0:18-cv-02086-PAM-KMM   Document 1   Filed 07/23/18   Page 39 of 45


Stat. § 549.20.

290.     Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees
under 42 U.S.C. § 1988.

## COUNT II

### 42 U.S.C. § 1983 – CONSPIRACY – PRE- AND POST-SHOOTING
*Plaintiff v. Defendants Mohamed Mohamed Noor and Matthew Thomas Harrity*
*in their individual capacities*

291.     Plaintiff realleges and incorporates by reference herein each and every
allegation contained in each paragraph above as though fully set forth herein.

292.     By the actions described above, including: 1) Noor and Harrity's conscious
decisions, made in concert, not to properly activate the recording and permanent memory
function of their body-worn cameras when they were assigned to the call from Justine;
2) Noor and Harrity's conscious decisions, made in concert, not to properly activate the
recording and permanent memory function of their body-worn cameras when they arrived at
the neighborhood alleyway;  3) Noor and Harrity's conscious decisions, made in concert, not
to properly activate the recording and permanent memory function of their body-worn
cameras when they drove through the neighborhood alleyway; 4) Noor and Harrity's
conscious decisions, made in concert, not to properly activate the recording and permanent
memory function of their body-worn cameras prior to any anticipation of the use of force;
5) Noor and Harrity's conscious decisions, made in concert, not to properly activate the
recording and permanent memory function of their body-worn cameras until well after
Noor's fatal shooting of Justine; 6) Noor's decision to invoke the Fifth Amendment; and
7) Harrity's decision to contrive a new story regarding the events of July 15, 2017, differing

materially from his original story to Sergeant Barnette, to provide subjective cover for Noor whether Noor continues to invoke his Fifth Amendment rights against self-incrimination or testifies at his criminal trial and adopts Harrity's after-the-fact, after-the-lawyer consult, contrivance of a subjective but objectively baseless fear, Defendants Noor and Harrity conspired to conceal the truth surrounding the unlawful and unconstitutional killing of Justine.

293.    Through these actions both prior to and after Justine's death, Defendants ensured that only Harrity's fictitious version of the events of July 15, 2017, would be told before the criminal trial.

294.    As a direct and proximate result of their acts and omissions,  Defendants Noor and Harrity conspired to deprive Justine of her clearly established and well-settled civil rights, frustrated and continue to frustrate the prosecution of Noor and of Justine's civil rights, and caused damages in an amount exceeding $50,000,000.

295.    Punitive damages are available against Harrity and Noor and are hereby claimed as a matter of federal common law under *Smith v. Wade*, 461 U.S. 30 (1983), and as such, are not subject to the pleading requirements or the differing standard of proof set forth in Minn. Stat. § 549.20.

296.    Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

## COUNT III

### CIVIL RIGHTS VIOLATION – FAILURE TO TRAIN
### UNDER *CITY OF CANTON V. HARRIS*
### *Plaintiff v. City of Minneapolis*

297.   Plaintiff realleges and incorporates by reference herein each and every allegation contained in each paragraph above as though fully set forth herein.

298.   Before July 15, 2017, the City of Minneapolis, with deliberate indifference to the rights of citizens, failed to ascertain whether hundreds of Minneapolis police officers were actually trainable or fit for duty.  By that, Plaintiff means "free from any emotional and mental condition which might adversely affect the performance of peace officer duties," including emotional or mental conditions that would make them succumb to their subjective, but objectively unreasonable, fears.  Minn. R. 6700.0700, subpart 1(I).

299.   Before July 15, 2017, the City of Minneapolis, with deliberate indifference to the rights of citizens, failed to properly train Defendants Noor and Harrity and failed to require and ensure the rank and file's adherence to appropriate policies to avoid the improper use of deadly force on citizens.

300.   Before July 15, 2017, the City of Minneapolis, with deliberate indifference to the rights of citizens, failed to properly train Defendant Noor, Defendant Harrity, and other MPD officers regarding the necessity and use of body-worn cameras and failed to require adherence to appropriate policies regarding the use of body-worn cameras meant to enhance accountability and acquire evidence to prevent the police officers from lying to protect their brothers in blue.

301.   The City of Minneapolis, former MPD Chief Harteau and former Assistant

and current MPD Chief Arradondo ratified and approved Defendants Noor's and Harrity's

misconduct and failed to discipline them, and other officers who have engaged in the same

or similar conduct, with regard to excessive use of force and violations of the BWCs Policy.

Consequently, there has been tacit approval of deficient policies, of deficient customs or

practices and of inadequate training regarding the use of deadly force and the use of BWCs,

which allows illegal uses of force to occur and to go unchecked and unseen in direct

violation of the stated, obvious, and critical purpose of the BWCs.

302.    Justine's death and the violation of her rights were directly and proximately

caused by the aforementioned acts and omissions and by the City's failure to train, and the

City of Minneapolis is thereby liable in an amount exceeding $50,000,000.

303.    Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees

under 42 U.S.C. § 1988.

## COUNT IV

### *MONELL V. DEP'T OF SOCIAL SERVICES*
### *Plaintiff v. City of Minneapolis and Minneapolis*
### *Chiefs Harteau and Arradondo in their official capacities*

304.    Plaintiff realleges and incorporates by reference herein each and every

allegation contained in each paragraph above as though fully set forth herein.

305.    Before July 15, 2017, the City of Minneapolis, with deliberate indifference to

the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted, and/or

ratified a custom, pattern or practice on the part of its officers, including Defendant Noor

herein, of the improper use of deadly force on citizens, and Noor and Harrity from the

failure to obtain unimpeachable evidence of the BWCs to show us the truth of police

interaction with citizens that eventuates in death and injury to the citizens.

306.   Before July 15, 2017, the City of Minneapolis, with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted, and/or ratified a custom, pattern or practice on the part of its officers, including the individual Defendants herein, regarding frustrating individuals' rights through the use of untruthful statements and maintaining the blue wall of silence.

307.   Through former MPD Chief Harteau and former Assistant and current MPD Chief Arradondo and the department's ratification and approval, and by failing to discipline all officers consistently on these points, there has been an approval of a constitutionally violative policy, custom or practice of 1) improper use of force and deadly force; 2) evidence gathering; and 3) truth telling.

308.   Further, since 2012, the City of Minneapolis, with deliberate indifference to the rights of citizens, initiated, tolerated, permitted, failed to correct, promoted, and/or ratified a custom, pattern or practice on the part of its officers, including the individual Defendants herein, of improper screening processes for MPD candidates, putting dangerously unqualified officers on the street to make life and death decisions.

309.   Through former MPD Chief Harteau and current MPD Chief Arradondo and the department's ratification and approval, and by failing to implement the proper assessors for MPD candidates and by failing to use the proper tests during said assessments, there has been an approval of a deficient policy, custom or practice for the selection and hiring of MPD officers, putting dangerously unqualified officers on the street unable to properly process and objectively make decisions on the use of appropriate force.

310.    Justine's death and the violation of her rights were directly and proximately caused by the aforementioned *Monell* acts and omissions and by the City and Defendants Harteau and Arradondo and they are thereby liable in an amount exceeding $50,000,000.

311.    Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff John Ruszczyk prays for judgment against Defendants as follows:

1.      That this Court find that the Defendants committed acts and omissions violating the Fourth and Fourteenth Amendments to the United States Constitution, actionable under 42 U.S.C. § 1983;

2.      As to Count I, a money judgment against Defendant Mohamed Mohamed Noor for compensatory damages and punitive damages in an amount in excess of $50,000,00.00, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

3.      As to Count II, a money judgment against Defendants Mohamed Mohamed Noor and Matthew Thomas Harrity for compensatory damages and punitive damages in an amount in excess of $50,000,000.00, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

4.      As to Count III, a money judgment against Defendant City of Minneapolis, for compensatory damages in an amount in excess of $50,000,000.00, together with costs, including reasonable attorneys' fees under 42 U.S.C. § 1988 and prejudgment interest;

5.      As to Count IV, a money judgment against Defendants Janeé Harteau,

Medaria Arradondo and the City of Minneapolis, for compensatory damages in an amount in

excess of $50,000,000.00, together with costs, including reasonable attorneys' fees under 42

U.S.C. § 1988 and prejudgment interest; and

6.      For such other and further relief as this Court may deem just and equitable.


**GASKINS BENNETT & BIRRELL L.L.P.**


Date: 7/23/18

Robert Bennett, #6713
Andrew J. Noel, #322118
Kathryn H. Bennett, #0392087
333 South Seventh Street, #3000
Minneapolis, MN 55402
Telephone: 612-333-9500
rbennett@gaskinsbennett.com
anoel@gaskinsbennett.com
kbennett@gaskinsbennett.com